IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| LISA BENSON COOPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 17-0041-CV-W-BP |
| | ) | |
| KSHB-TV 41 and SCRIPPS MEDIA, INC., | ) | |
| | ) | |
| Defendants | ) | |

## ORDER AND OPINION GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Since March 2004, Lisa Cooper, ("Plaintiff"), has worked as a general assignment reporter for a television station in Kansas City, Missouri. The station is owned by Scripps Media, Inc. ("Defendant").[1] In this lawsuit, Plaintiff, an African-American woman, has asserted several claims of discrimination arising from her employment.

The Amended Complaint, (Doc. 21), contains two counts, each of which asserts three claims. Count I is based on the Missouri Human Rights Act, ("the MHRA"), and Count II is based on 42 U.S.C. § 1981. Both counts allege that Plaintiff was denied promotions and other job opportunities based on her race, subjected to a hostile work environment, and suspended in retaliation for registering complaints of discrimination.

Defendant has filed a Motion for Summary Judgment, which Plaintiff has opposed. As discussed more fully below, the Court finds that there are disputed issues of material fact that require rejection of most of Defendant's arguments. The motion, (Doc. 88), is granted to the extent that it seeks summary judgment on Plaintiff's hostile work environment claim and to the

---

[1] Plaintiff has also named "KSHB-TV 41" as a defendant, but she agrees that this is a fictitious name for the television station. (Doc. 101, p. 1 (agreeing with Defendant's Statement of Uncontroverted Fact No. 5).) Therefore, Scripps Media, Inc. is the only defendant in this case.

extent that Plaintiff raises claims about events that occurred outside of the applicable limitation period. Defendant's motion is denied in all other respects.[2]

## I. BACKGROUND

The Court begins by observing, as discussed in Part II below, that it is required to view the facts in the Record in the light most favorable to Plaintiff. This is significant because Defendant has presented over 180 statements of allegedly uncontroverted facts, and these facts (individually and collectively) are generally presented in the light most favorable to Defendant. Often, facts are omitted (such as contrary witness statements or uncited portions of documents).[3] There is no reason for the Court to identify all of the factual disputes or restate the entire Record in the light most favorable to Plaintiff because it is ultimately the jury's role to find the facts. It is enough for the Court to observe that factual disputes exist. As a result, the Court's discussion of the facts will be abbreviated and will combine a general description of the case with the uncontroverted facts that are relevant to the extent this Order grants Defendant's motion.

Plaintiff concedes that during her employment with Defendant "she has never heard racially derogatory language, epithets, jokes, or slurs, or seen any race-based symbols or images" in the workplace. (Doc. 101, p. 3 (agreeing with Defendant's Statement of Uncontroverted Fact No. 27).) Rather, Plaintiff contends that she suffered repeated acts of unfair treatment, including denial of various work opportunities. In 2010, Plaintiff contends that she was a finalist for a morning anchor position, but the job was given to a woman Plaintiff has described as "biracial." (Doc. 101, p. 45.) Also in that year, Plaintiff was assigned a story that required her to knock on the front door of a house belonging to a member of the KKK. Around that same time period,

---

[2] Plaintiff's request for oral argument is denied.

[3] For these (and other) reasons, the Court denies Defendant's argument that the Court should "not consider Plaintiff's Response and deem all of Defendant's uncontroverted facts admitted." (Doc. 108, p. 5.)

2

Plaintiff was sent to cover a story about a water main break that she believed jeopardized her safety.[4]  In June 2012, Defendant started a television program called *Kansas City Live* and the two hosts were both Caucasian; however, Plaintiff does not allege that she applied to be a host of the show.  (*See* Doc. 101, p. 46 (Plaintiff's Statement of Uncontroverted Fact No. 11).)  All of these incidents occurred when Peggy Phillips was the News Director, and she left in July 2012.

Plaintiff also discusses the fact that she was assigned to cover stories in "the urban core." The few details provided are contained in Plaintiff's administrative charges.  Her first charge states that in or after August 2013 she "was repeatedly sent out to the 'urban core' for all of" her assignments.  (Doc. 101-13, p. 4.)  However, it also states that this occurred before she was sent to the KKK member's home, (*id.*), which, as noted earlier, occurred in 2010.  In her supplement to this administrative charge, Plaintiff clarified that Phillips was the News Director when she "was repeatedly sent out to the 'urban core' for all of my assignments because that is what I was 'used' to."  (Doc. 101-40, p. 2.)  But, as noted, Phillips was no longer the News Director as of July 2012, further suggesting that this assignment did not occur in or after 2013.  Regardless, no further details about Plaintiff's assignment to the urban core are discussed.  In particular, the parties do not identify anything in the Record addressing who (if anyone) actually told her that she was assigned to the urban core because she was "used to" it, how long she was assigned to the urban core, whether she was assigned anything else in addition, whether others were also assigned to cover stories in the urban core, or anything else about the assignment.  The only additional related information referred to by the parties is the fact that "reporters have been expected to perform assignments in all parts of the Kansas City Metro without regard to

---

[4] There have been various unsworn declarations as to when the incident at the KKK member's house and the water main story occurred.  However, Plaintiff's testimony and the e-mail she sent to herself to memorialize these events confirm that both occurred in or before August 2010.  Doc. 92-7, p. 25 (Plaintiff's Dep. at 217); *see also* Doc. 92-67.)

3

assumptions of whether the particular area . . . is considered more dangerous than another area. Assignments of stories are often based on the availability of a reporter, and whether the reporter has already been assigned to another story." (Doc. 92-25, ¶ 7.) Plaintiff declares that after her internal complaints regarding safety, Defendant developed – with her input – "Safety Guidelines to help protect reporters . . . . Since the adoption of these safety guidelines, it has assisted Ms. Benson in setting boundaries for times she is afraid for her safety and well-being due to dangerous conditions." (Doc. 101, p. 40 (responding to Defendant's Statement of Uncontroverted Fact No. 171).)

In May 2013 (after Carie Hofmann became the News Director), the morning anchor position Plaintiff applied for in 2010 re-opened, and the position was given to a Caucasian woman. In February 2014, Plaintiff applied to be a Leadership Champion. A Leadership Champion has additional duties and does not earn additional pay, but there is a factual dispute as to whether being a Leadership Champion has any effect on an employee's promotion/career prospects. Plaintiff was not chosen to be a Leadership Champion; two Caucasian employees were chosen. One of those individuals resigned in August 2014, and was replaced with another Caucasian employee.[5]

In April 2015, a Caucasian woman was hired to be an Investigative Reporter; the position was not offered to Plaintiff. There is a factual dispute as to whether Plaintiff applied for or was interested in this position. Later in April 2015, Plaintiff wrote e-mails and had conversations with her supervisor (Melissa Greenstein) and Hofmann about her schedule. In one of those e-mails, (Doc. 92-11), Plaintiff expressed her concern that employees are placed on weekend shifts

---

[5] The parties also provide information about a morning anchor position that opened in late 2014 or early 2015. However, the Record establishes that this position was offered to an African-American woman. (Doc. 92-25, ¶ 11; *see also* Doc. 101, pp. 33-34 (not disputing this aspect of Defendant's Statement of Uncontroverted Fact No. 130).) The Court does not understand Plaintiff to be contending that she was denied this job based on her race so there is no need to discuss this position further.

4

as a means of getting them to resign and listed two examples. There is a factual dispute as to the content of the remaining communications, including whether Plaintiff suggested that African-Americans were disproportionately targeted in this manner. Plaintiff eventually participated in a meeting with a representative from Human Relations, Julie Moorehouse, and a memo Moorehouse wrote on May 5, 2015 indicates that Plaintiff expressed concerns about the treatment of minorities. (Doc. 101-48.) Two weeks later, Plaintiff had a meeting with Greenstein. There is a factual dispute as to whether yelling occurred during the meeting. The evidence that yelling occurred is also in conflict as to whether both participants were yelling or if all of the yelling was done by Plaintiff. An investigation ensued, and on May 26, 2015, Plaintiff was suspended without pay. There are factual disputes as to (1) whether the investigator talked to Plaintiff and (2) what the investigator was told about who was yelling.

Plaintiff filed an administrative charge with the Missouri Human Rights Commission, ("MHRC"), on June 1, 2015, and supplemented this charge approximately two weeks later. This charge alleged, among other things, that Plaintiff was subjected to race discrimination, retaliation, and a hostile work environment.[6] Plaintiff filed a second charge on September 21, 2015, alleging retaliation. Plaintiff obtained right to sue letters on her two charges in September 2016 and December 2016, respectively. She initiated this suit in state court in December 2016, asserting claims under the MHRA. Defendant removed the case to federal court (with jurisdiction predicated on 28 U.S.C. § 1332). Plaintiff filed an Amended Complaint on April 21, 2017, adding a claim under 42 U.S.C. § 1981.

---

[6] The parties dispute whether this charge also raised a claim of gender discrimination. There is no need for the Court to resolve this issue because the Amended Complaint does not present a claim of gender discrimination.

## II.  DISCUSSION

A moving party is entitled to summary judgment on a claim only upon a showing that "there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *See generally Williams v. City of St. Louis*, 783 F.2d 114, 115 (8th Cir. 1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011) (quotation omitted).  In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Tyler v. Harper*, 744 F.2d 653, 655 (8th Cir. 1984), *cert. denied*, 470 U.S. 1057 (1985).  A party opposing a motion for summary judgment may not rest on mere allegations or pleading denials, but must point to evidence in the Record demonstrating the existence of a factual dispute.  Fed. R. Civ. P. 56(c)(1); *Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 909-10 (8th Cir. 2010).

In some instances, Defendant has demonstrated that the Record lacks evidence of certain facts that are necessary to Plaintiff's theories of liability, which obligates Plaintiff to identify portions of the Record establishing the existence of such evidence.  "[I]f the nonmoving party must prove *X* to prevail, the moving party at summary judgment can either produce evidence that *X* is not so or point out that the nonmoving party lacks the evidence to prove *X*." *Bedford v. Doe,* 880 F.3d 993, 996-97 (8th Cir. 2018) (citation omitted); *see also Celotex Corp. v. Catrett,* 477

6

U.S. 317, 323-23, 25 (1986); *St. Jude Med., Inc. v. Lifecare Int'l, Inc.,* 250 F.3d 587, 596 (8th Cir. 2001).

Plaintiff largely argues that Defendant's motion should be denied because summary judgment is disfavored and rarely granted by Missouri courts. The Court disagrees. The Court is obligated to follow Missouri's substantive law with respect to the MHRA claim, but summary judgment is a procedural device, not a substantive matter. The Court should apply Rule 56 of the Federal Rules of Civil Procedure and the case law interpreting it, and should not rely on general and anecdotal observations about the frequency with which Missouri courts grant such motions. "There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Torgerson v. City of Rochester,* 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc). While discrimination cases may be fact intensive, summary judgment is appropriate (as is true in any case) if the facts are undisputed or the Record demonstrates that the plaintiff cannot present evidence to support his or her claim. *Pye v. Nu Aire, Inc.,* 641 F.3d 1011, 1018 (8th Cir. 2011).

## A. Discrimination Claims[7]

Defendant presents two arguments related to Plaintiff's discrimination claims. The first argument addresses the extent to which Plaintiff can recover for acts that occurred outside the statute of limitations. In its second argument, Defendant contends that the uncontroverted facts demonstrate that Plaintiff cannot prevail on her timely claims. Defendant presents these arguments with respect to both the § 1981 claim and the MHRA claim.

### *1. Timeliness as Related to Plaintiff's § 1981 Discrimination Claim*

The parties agree that the statute of limitations for a § 1981 claim is four years. *See Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369 (2004). Plaintiff asserted her § 1981 claim on

---

[7] For the sake of clarity, the Court will address the issues in a different order than was utilized by the parties.

April 21, 2017, so her claim is timely with respect to events on or after April 21, 2013. Plaintiff contends that she is entitled to extend her § 1981 claim to challenge all actions that occurred from 2010 to the present because they are part of a single, continuing violation.

The Court does not agree with Plaintiff. Under federal law a continuing violation exists when events occurring within the limitation period are part of or connected to conduct occurring before the time period began, such that the entirety of the conduct constitutes a single employment practice. *E.g., National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 106-08 (2002); *Madison v. IBP, Inc.,* 330 F.3d 1051, 1057 (8th Cir. 2003) (applying *Morgan* to claims under § 1981). A continuing violation most commonly applies when a plaintiff asserts a hostile work environment claim, because by its nature such a claim occurs over time and it is difficult to pinpoint the precise moment in which it occurs. *Morgan,* 536 U.S. at 118. In contrast, *Morgan* specifically stated "that discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period," *id.* at 112, and "[a] discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened,'" thereby triggering the time period for the employee to take action. *Id.* at 110. Therefore, discrete acts – such as termination, suspension, and failure to promote – do not form a continuing violation under federal law. *E.g., Jones v. City of St. Louis, MO,* 825 F.3d 476, 482 (8th Cir. 2016); *Richter v. Advance Auto Parts, Inc.,* 686 F.3d 847, 851 (8th Cir. 2012).

Plaintiff compares her situation to *Madison*, (Doc. 100, p. 33), but that case is distinguishable. In *Madison* the Eighth Circuit stated that the plaintiff "*also* proved a continuing violation of her rights based upon failure to promote and constructive demotion," but this statement was made when the Court of Appeals was applying Iowa, not federal, law. *Madison,* 330 F.3d at 1058 (emphasis supplied). Moreover, as the quote suggests, the plaintiff proved

8

Case 4:17-cv-00041-BP   Document 115   Filed 04/02/18   Page 8 of 16

more than just the denial of promotions; she also presented evidence of a lengthy course of ridicule, intimidation, and insults. *Id*. at 1053; *see also Madison v. IBP, Inc.,* 257 F.3d 780, 785-86 (8th Cir. 2001), *vacated and remanded,* 536 U.S. 919 (2002). Thus, the continued denial of promotions occurred at the same time as a larger sequence of events that independently constituted a continuing violation; whereas in this case there is no sequence of events that can be properly characterized as a continuing violation. Finally, the gap in time between Plaintiff's promotion denials, and their limited number, demonstrates the lack of connectedness necessary to establish a continuing violation. These facts also further differentiate this case from *Madison*, where the plaintiff was denied twenty-three promotions in a six year span. *Madison,* 257 F.3d at 800. For these reasons, the Court concludes that the Record does not establish a continuing violation under federal law.

### 2. Timeliness as Related to Plaintiff's MHRA Discrimination Claim

An administrative charge must be filed with the MHRC within 180 days of the alleged violation. Mo. Rev. Stat. § 213.075.1. Plaintiff filed her first administrative charge on June 1, 2015, making it timely with respect to all events occurring on or after December 3, 2014. As with her § 1981 claim, Plaintiff contends that her MHRA claim can go back further in time because she has alleged a continuing violation. The Court disagrees.

Under Missouri law, a continuing violation allows a plaintiff to seek recovery for acts that occur more than 180 days before the administrative charge is filed. *See Tisch v. DST Sys., Inc.,* 368 S.W.3d 245, 252 (Mo. Ct. App. 2012). "A plaintiff must establish two things to take advantage of the continuing violation theory. First, she must demonstrate that at least one act occurred within the filing period. Further, she must establish that the [discrimination] is a series of interrelated events, rather than isolated or sporadic acts of intentional discrimination."

9

*Pollock v. Wetterau Food Distribution Grp.,* 11 S.W.3d 754, 763 (Mo. Ct. App. 1999) (citations omitted). Thus, Missouri law is similar to federal law, particularly with respect to the requirement that the discrimination be characterized as a series of connected events as opposed to discrete employment decisions. In fact, Missouri courts have relied on the Supreme Court's decision in *Morgan* to hold that decisions such as termination, failure to hire or promote, and denial of transfers are discrete acts that do not constitute a continuing violation. *Tisch,* 368 S.W.3d at 254-55 (citing *Morgan*, 536 U.S. at 110, 113-114); *see also Rowe v. Hussmann Corp.,* 381 F.3d 775, 782 (8th Cir. 2004) (observing that Missouri law is "consistent with *Morgan*.") Therefore, for the reasons stated above with respect to Plaintiff's § 1981 claim, the Court concludes that the Record does not support the existence of a continuing violation under Missouri law.

Plaintiff compares her case to *Plengemeier v. Thermadyne Indus.,* 409 S.W.3d 395 (Mo. Ct. App. 2013), but *Plengemeier* is distinguishable. There, the Missouri Court of Appeals held that while claims of sexual harassment, hostile work environment, and constructive discharge are "uniquely suited for and give rise to the equitable continuing violation doctrine, . . . the continuing violation doctrine is not exclusive to them." 409 S.W.3d at 402. However, *Plengemeier* did not alter the requirement "that the disparate treatment [be] comprised of a series of interrelated events, rather than isolated or sporadic acts of intentional discrimination." *Id.* at 401 (citing *Pollock,* 11 S.W.3d at 763). Instead, the plaintiff in *Plengemeier* was found to have alleged more than just isolated or sporadic acts of discrimination. The plaintiff alleged that she was provided less pay and benefits than similarly situated men over the entire course of her employment, and that her pay and benefits were reviewed annually, making each individual decision connected to the next. *Id.* at 401-02. In this case, the Record reveals no such

connection between the discrete decisions at issue. At best, Plaintiff's claim involves promotion denials based on race in 2010, June 2012, and May 2013, and April 2015.[8] These promotion denials are not a continuous or otherwise connected chain of events like the annual review of the plaintiff's pay alleged in *Plengemeir*, and the three promotion denials outside the limitation period are not connected to Plaintiff's earliest timely promotion claim (the failure to promote Plaintiff to Investigative Reporter in April 2015). The other actions Plaintiff relies upon (the failure to select her as a Leadership Champion and work assignments in the urban core) also lack a connection to any events within the relevant time period.[9]

Plaintiff has alleged that she was subjected to discrete acts of discrimination, none of which extended over a period of time and none of which have any connection to each other except for the fact that they involve promotions. This is not comparable to *Plengemeier* and is not an example of a continuous violation. Therefore, Plaintiff cannot extend her discrimination claim to events that occurred before the limitation period.

### 3. Plaintiff's Timely Discrimination Claims

With respect to Plaintiff's timely discrimination claims, Defendant presents numerous arguments in an attempt to demonstrate that (1) Plaintiff cannot present a prima facie case of discrimination, (2) it had legitimate non-discriminatory reasons for all of the actions it took, or (3) Plaintiff cannot establish that Defendant's explanations are a pretext for discrimination. The Court finds it appropriate to address these arguments together.

---

[8] The Court includes June 2012 even though there is no evidence that Plaintiff applied to be a host of *Kansas City Live*.

[9] It is also worth noting that *Plengemeier* involved dismissal of the plaintiff's claims at the pleading stage. In contrast, here (as in *Tisch*) the Court is reviewing the Record developed by the parties through discovery.

11

As an initial matter, the parties disagree as to which version of the MHRA applies in this case. The MHRA makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race. . . . ." Mo. Rev. Stat. § 213.055.1(1)(a) (emphasis supplied). Until 2017, Missouri courts held that an employment decision was "because of" the plaintiff's race if the plaintiff's race was a "contributing factor" in the employment decision at issue. In 2017, and after Plaintiff's suit was filed, the Missouri Legislature amended the MHRA to include a definition clarifying that the phrase "because of" means "the protected criterion was the motivating factor." Mo. Rev. Stat. § 213.010(2). The parties dispute whether the 2017 amendment applies retroactively and thus should govern in this case, but there is no need for the Court to resolve the issue at this time. The Court's decision with respect to Defendant's motion would be the same regardless of which version applies, so there is no present need to resolve the issue. Moreover, the Missouri Supreme Court has not addressed this matter. *See United Fire & Casualty Ins. Co. v. Garvey,* 328 F.3d 411, 413 (8th Cir. 2003) (describing a federal court's task when confronted with unsettled questions of state law). If the Court waits until it is necessary to resolve the issue, there may be more guidance from Missouri courts.

With respect to the discrimination claims, there are disputed issues of material fact that must be resolved by a jury. As stated earlier, the Court will not itemize all of the factual disputes. But, for instance, there are factual disputes regarding the reason Plaintiff was not offered the investigative reporter position in April 2015, including whether she was qualified and whether Defendant had legitimate non-discriminatory reasons for offering the job to someone else. Therefore, Defendant's request for summary judgment on Plaintiff's state and federal discrimination claims is denied.

## B. Hostile Work Environment

Defendant contends that the uncontroverted facts in the Record demonstrate that it is entitled to judgment as a matter of law on Plaintiff's hostile work environment claim. The Court will analyze the issue separately for Plaintiff's claims under § 1981 and the MHRA.

### *1. Hostile Work Environment Under § 1981*

In order to establish a hostile work environment claim, there must be facts that would permit a jury to find that (1) Plaintiff belongs to a protected group, (2) she was subjected to unwelcome racial harassment, (3) the harassment was because of her race, and (4) the harassment was sufficiently severe or pervasive so as to affect a term, condition, or privilege of her employment. *E.g., Singletary v. Missouri Dep't of Corr.,* 423 F.3d 886, 892 (8th Cir. 2005). The fourth element contains both objective and subjective components, and the objective component requires consideration of all the circumstances in the workplace, "including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." *Clay v. Credit Bureau Enterprises, Inc.,* 754 F.3d 535, 540 (8th Cir. 2014). "The workplace must be permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive." *Anderson v. Durham D&M, LLC,* 606 F.3d 513, 518 (8th Cir. 2010) (quotation omitted); *see also Bainbridge v. Loffredo Gardens, Inc.,* 378 F.3d 756, 759 (8th Cir. 2004). The conduct must be "extreme in nature and not merely rude or unpleasant." *Nitsche v. CEO of Osage Valley Elec. Coop.,* 446 F.3d 841, 846 (8th Cir. 2006).

As noted earlier, Plaintiff concedes that she heard no racially-based insults, comments or the like. She must, therefore, identify the evidence that will support her claim of a racially hostile work environment. Her argument, (Doc. 100, pp. 32-33; *see also* Doc. 100, p. 18),

13

focuses on the denial of promotions and contends that the repeated denial of promotions demonstrates the severity and pervasiveness of the "harassment." [10] This argument, however, is undermined by the previously-cited cases establishing that promotion denials are discrete acts that must be raised in a timely manner based on when those denials occur. The events allegedly contributing to the hostile work environment not only were discrete events, but they occurred over a lengthy period of time, further demonstrating that Plaintiff's workplace was not "permeated" with intimidations, ridicule, and insults. *See Malone v. Ameren UE,* 646 F.3d 512, 517 (8th Cir. 2011) (four isolated events over two years "considered as a whole, are not sufficiently severe or pervasive to establish a hostile work environment.").

The failure to award promotions based on race qualifies as an actionable discriminatory wrong, but it is not "severe" or "pervasive" and so does not satisfy the standard for a hostile work environment. Therefore, Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim under § 1981.[11]

### 2. Hostile Work Environment Under the MHRA

Under the MHRA, a hostile work environment claim requires proof that (1) the plaintiff is a member of a protected class, "(2) the plaintiff was subjected to unwelcome protected group harassment;" (3) the plaintiff's membership in the protected class contributed to the harassment, "and (4) a term, condition, or privilege of the plaintiff's employment was affected by the harassment." *Fuchs v. Department of Revenue*, 447 S.W.3d 727, 732 (Mo. Ct. App. 2014).

---

[10] Plaintiff does not discuss her assignments to the urban core when discussing her hostile work environment claim. (Doc. 100, pp. 32-33.) Nonetheless, the facts about those assignments would not support the existence of a hostile work environment. Plaintiff concedes that all reporters were assigned to work in the urban core, there is no evidence in the Record that would permit a jury to conclude that the assignments were of such frequency or duration as to constitute a hostile working environment, and the Record establishes that Plaintiff's concerns about the assignments were alleviated long before the limitation period started.

[11] To the extent that Plaintiff relies on *Madison*, the Court concludes that the cases are distinguishable for the reasons stated earlier, (*see* pages 8-9, *supra*), particularly because the Plaintiff in that case presented evidence ridicule, intimidation, and insults that extended over an extended period of time.

14

"[D]iscrimination creates an actionable hostile work environment when discriminatory conduct either creates an intimidating, hostile, or offensive work environment or has the purpose or effect of unreasonably interfering with an individual's work performance. Stated differently, the creation of an abusive working environment impacts a condition or privilege of employment, and is thus an actionable 'adverse employment action,' if the conduct creating the environment is sufficiently severe or pervasive." *Id.* at 733 (quotations omitted). Missouri law is also similar to federal law in that "harassing conduct must be sufficiently severe or pervasive both as viewed subjectively by the plaintiff and as viewed objectively by a reasonable person." *Id.* at 727; *see also Lynn v. TNT Logistics N. Am., Inc.*, 275 S.W.3d 304, 308 (Mo. Ct. App. 2008) (for comments to constitute harassment they must "go[ ] beyond the harmless comments or boorish conduct . . . .").

The Court's analysis is similar to its analysis of the hostile work environment claim under § 1981. As noted previously, Plaintiff concedes that there were no comments, slurs, or other facts that created an intimidating or hostile environment. The denial of promotions may have been discriminatory, but this does not satisfy the legal standard for a hostile work environment. Thus, Defendant is entitled to summary judgment on Plaintiff's MHRA hostile work environment claim.

### C. Plaintiff's Retaliation Claims

Defendant argues that it is entitled to summary judgment on Plaintiff's retaliation claims under both § 1981 and the MHRA because (1) she was "in the process of being disciplined" when she filed her administrative complaints with the MHRC and (2) there is no evidence that any of the individuals involved in her suspension knew about her informal complaints. While it is true that Plaintiff did not file her administrative charge until June 1, there are factual disputes

as to (1) whether Plaintiff complained to Greenstein or Hofmann about racially discriminatory treatment before meeting with Moorehouse, (2) who, if anyone, knew that Plaintiff made such complaints to Greenstein, Hofmann, or Moorehouse, (3) the manner in which the investigation into the yelling incident was conducted, and (4) the reasoning behind Defendant's decision to suspend Plaintiff.  Viewed in the light most favorable to Plaintiff, the Record contains evidence that would allow a jury to find that she was suspended in retaliation for her complaints of discrimination, so summary judgment cannot be granted on this claim.

### III.  CONCLUSION

Defendant is granted summary judgment on Plaintiff's claims of hostile working environment.  Defendant is also granted summary judgment on all claims involving acts that (1) with respect to the MHRA claim, occurred before December 3, 2014 or (2) with respect to the § 1981 claim, occurred before April 21, 2013.  Defendant's Motion for Summary Judgment is denied in all other respects.

**IT IS SO ORDERED.**

/s/ Beth Phillips
BETH PHILLIPS, JUDGE
DATE: April 2, 2018     UNITED STATES DISTRICT COURT