# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION



LISA BENSON COOPER,           )
                              )
        Plaintiff,            )
                              )
v.                            )   No. 17-00041-CV-W-BP
                              )
KSHB-TV 41, *et al.*,         )
                              )
        Defendants.           )

## EXPERT DISCLOSURE UNDER RULE 26(a)(2)

This Expert Report is submitted pursuant to the requirements of Rule 26(a)(2) of the Federal Rules of Civil Procedure.

1. ***Background and Qualifications of Monica R. Biernat, Ph.D.***

Monica Biernat, Ph.D., is a University Distinguished Professor of Psychology at the University of Kansas. She trained as a social psychologist at the University of Michigan and previously served on the faculty at the University of Florida, and as a visiting scholar at the University of British Columbia, the University of Washington, and the University of Wisconsin. She is currently Executive Officer of the Society of Experimental Social Psychology, and Editor of *Personality and Social Psychology Review*. At KU, she is Associate Chair of the Department of Psychology and Chair of the Lawrence campus Institutional Review Board.

Dr. Biernat's research focuses on race and gender discrimination, and particularly on how race and gender affect evaluations of individuals, as in academic and work settings. She has published over 100 empirical papers, chapters and books describing research on the ways in which race and gender bias can affect evaluative judgments, sometimes in subtle ways. Her research is widely cited, and has won awards from the American Psychological Association and the Association for Women in Psychology. Dr. Biernat has also been part of an inter-

1

disciplinary team (including social scientists, lawyers, and business leaders) engaged in developing interventions to interrupt bias in work settings.

Dr. Biernat's latest Curriculum Vitae is attached, and made a part of this document.

2. *List of All Cases in The Past 4 Years Where Dr. Biernat Has Testified As an Expert At Trial Or By Deposition*

None.

3. *Statement of Compensation for Non-Testimony Expert Work and Testimony By Deposition and Trial*

My hourly charge for review of materials leading up to the filing of this Expert Report is $300; My standard hourly charge for testimony by deposition and for trial is $400.

4. *Facts or Data Considered in Forming Opinions That Monica Biernat Will Express*

I was provided the original complaint filing and amendments, along with a timeline provided by Lisa Benson Cooper; an assortment of work-related email exchanges provided by Ms. Benson; the discrimination charge of Dee Jackson; and other documents provided by the Popham Law Firm. I understand no depositions have yet been taken. I will need access to all depositions and exhibits, and understand that plaintiff's counsel will provide them to me as discovery continues. It is my understanding that discovery is just beginning, and is not scheduled to close until December 1, 2017. It is my understanding that my report can and will be supplemented under the Federal Rules of Civil Procedure, to ensure that the information provided for purposes of my disclosure is complete and correct.

5. *Statement of Opinions, Basis and Reasons For Them*

I was asked to consider the race discrimination/retaliation complaint and offer my expert opinion on the role that race and race bias may have played in the events described. I'll discuss what social science researchers have learned about race bias based on controlled experiments,

and how a number of the events/circumstances of Ms. Benson's case are consistent with these findings.

Race bias begins with stereotypic associations. Whether people personally endorse stereotypic beliefs or not, they are familiar with cultural stereotypes that associate Blacks/African Americans with (mostly negative) characteristics including aggression, laziness, and lesser competence in professional domains. Researchers have demonstrated that these stereotypic associations need not be invoked consciously or intentionally; indeed, stereotypes of groups may come to mind automatically upon encountering an individual member of the group. This quick association of groups with stereotypical attributes is what is typically meant by "implicit bias." What this means is that stereotypes may affect perceptions and judgments of individuals without one being aware of this influence. One implication is that a supervisor's claims that race (or gender) did not influence decision making is unlikely to be the case. Stated differently, race (or gender) bias is more likely true than not true.

Furthermore, race stereotypes convey a sense of the settings and roles (including type of work) in which members of different racial groups are expected to be found. A principle of "role congruity" operates, such that people are perceived as better "fits" to roles or positions that map onto stereotyped expectations. For example, the plaintiff's claim here that she was "consistently being sent to the urban core for all of her stories" is a good example of how stereotyped expectations may operate (Black reporter covers "urban" stories). The supervisor's explanation for the assignment that — "this is what you are used to" — only indicates that initial race effects on assignments may be perpetuated over time. The plaintiff also claims that during her career at KSHB-TV she has applied unsuccessfully for numerous promotions, and that these were "consistently rewarded to white employees with far less experience." I am not knowledgeable

3

about TV news operations, but to the extent that positions including anchor, consumer reporter, "Leadership Champion" and others are better fits with stereotyped beliefs about Whites than Blacks, plaintiff's perceived "lack of fit" with these roles may have been a factor in denying the promotions. More generally, Whites are more likely to be perceived as better "fits" to high status or "premium" roles than Blacks. Of course, it is not the case that Black employees are never placed in positions of this sort. But these may be exceptions, or these choices may be dictated by other factors (such as directives to "diversify").

Research also suggests that racial stereotypes play a role in "disambiguating" information. That is, stereotypes will most influence judgment and behavior when a situation is ambiguous, as when an employee's performance is average or mixed, or when there is some uncertainty about what has transpired in a situation. These contexts require more interpretation, and that circumstance opens the path for stereotypes (and other preconceptions) to play a larger role than would be the case in an unambiguous context. Related to this is the tendency to notice and remember mistakes more when enacted by members of negatively stereotyped, versus positively stereotyped groups.

The two instances in which the plaintiff faced suspension illustrate this point. In May of 2015, Ms. Benson had a meeting with Melissa Greenstein during which the two discussed the decision to use file video for a story. According to Ms. Benson, this was a professional exchange, but Ms. Greenstein ended the meeting abruptly and characterized Ms. Benson as "not receptive and combative" during the meeting. Ms. Benson's behavior was later characterized by Jessica Eggers as "disruptive" and "aggressive," (it had a bad "tone") and resulted in a 2-day suspension without pay. Implicit race associations may increase the likelihood that the same interaction style is perceived to be more aggressive when enacted by a Black individual than a White individual.

4

Whereas a White person might be perceived as "assertive," a Black person may be perceived as "aggressive." It is also seems unusual that the decision to suspend was reached without investigation including Ms. Benson's input on the exchange with Ms. Greenstein. Although as yet I have not reviewed a direct comparison involving a White employee, information received at this early date includes anecdotal evidence of more clear-cut aggression by White employees in the news room that did not seem to have received the same interpretation or the same punishment as Ms. Benson's.

In the second, more recent, suspension (August 2017), Ms. Benson was penalized for the airing of a story that included expletives. This story was photographed/edited by DelMeko Jordan. Laptop failure apparently prevented appropriate editing, and lack of experience with editing on live trucks added to this problem. As I understand, neither this photographer/editor, nor Mr. Morrison, who made the final edit, was penalized like Ms. Benson. This is a case where fault could reasonably be multiply determined, but the negative judgment fell on Ms. Benson. I cannot assess the extent to which KSHB-TV follows a policy whereby the reporter is ultimately to blame for mistakes of this sort, but from what I can gather it appears that fault lies with the final video gatekeeper, *not* Ms. Benson in this case. I understand the station may rationalize the differing discipline based on Ms. Benson already having a suspension, whereas this was the photographer/editor's "first" offense. In that event, the potentially biased first suspension of Ms. Benson serves to exacerbate negative effects on Ms. Benson. Implicit bias may lead to mistakes being more readily noticed and penalized for Blacks than Whites.

Race may also play a role in both the formal evaluations employees receive and the informal feedback they are given. I cannot evaluate whether Ms. Benson was evaluated "fairly" in her yearly performance reviews; I do not have adequate knowledge of her objective

5

Case 4:17-cv-00041-BP   Document 297-1   Filed 12/21/18   Page 6 of 11

performance, or company standards, or the kinds of evaluations comparable others received. Over Ms. Benson's career at KSHB-TV, she has generally received feedback that she "fully meets expectations." This would seem to be an adequate basis for promotion, but social science research suggests that members of negatively stereotyped groups — such as Blacks — may face at least two forms of evaluative bias: They are held to different standards that require them to "prove it again," and they may be allowed a narrower range of acceptable workplace behavior (sometimes referred to as walking a "tightrope").

My own research on race-based "shifting standards" has examined how members of groups that are stereotyped as less competent are held to higher standards to demonstrate their competence. For example, the same performance enacted by a White and Black individual may confirm competence in the White person, but not be sufficient to document competence in the Black person. This is the kind of shifting standard that requires Blacks to do more, to "prove it again," even following a very good performance. In Ms. Benson's case, for example, solid work may still not be sufficient to prove her competence to decision makers. In an April 2015 meeting with Ms. Hofmann, Ms. Benson was labelled an "inconsistent unbalanced reporter" who is "not good enough" to work a Monday-Friday dayside shift (which Ms. Benson had requested). Though apparently "fully meeting expectations," this level of performance was not seen as consistent or good enough to qualify for a desirable shift. Anecdotal evidence touching on experiences of other minorities will be important for assessing the extent to which this pattern appears more broadly at KSHB. For example, in her statement, morning meteorologist Courtney Nicole Phillips recounts being called the "minority hire" and having to spend time "proving to people that I belonged here and I was just as smart as my colleagues." She continued to receive

6

feedback that she "wasn't ready," for promotion, similar to the kind of "prove it again" feedback Ms. Benson received.

==Also relevant to requiring *more* from Blacks than Whites to document competence is applying a pattern of shifting *definitions of merit*.== As I noted above when discussing Ms. Benson's suspensions, certain behavioral rules that may have been in place for Ms. Benson may not have been applied in the same way for other (i.e., White) employees. For example, would a White reporter have been suspended for the same interaction style or for the same on-air mistake in which Ms. Benson was involved? Some examples provided suggest not, but I recognize that this is difficult to determine without a direct comparison case. I will await full development of discovery to assess this more definitely.

Ms. Benson applied for various positions over the years, as well as various opportunities for advancement (including conference attendance and requests for beat days). She received none of the requested promotions. Without more information, I cannot definitively evaluate claims that less qualified Whites were hired in each of these cases, but there does seem to be a pattern in which criteria for hiring shifted inappropriately (e.g., emphasizing "fresh meat" as a reason for selecting an anchor in one case, highlighting experience in the re-hiring a former anchor several years later). A similar pattern appears in the treatment of Dee Jackson, who had expectations of becoming Sports Director, following the retirement of then Director Jack Harry, when first hired at KSHB. Instead, after that retirement, Frank Boal was selected for this role (because of "PR concerns about passing over the old White guy"). Less than 2 years later, Mick Shaffer, another White male—held to less stringent vetting standards than Mr. Jackson—was hired. All 3 are White males. This suspicious series of events also indicates shifting criteria for evaluating candidates, such that Mr. Jackson was deemed not quite right for the job.

7

In requesting to be assigned "beat days," valuable time for developing stories, Ms. Benson was also offered conflicting accounts – e.g., that beat days are "optional offerings that are not always available" and shouldn't be expected; that beat days needed to be requested; that beat days were scheduled on a "rotating basis" (at least during the nightside shift); that beat days would be "dropped in for all reporters," etc. These changing rules allow for differential treatment; Ms. Benson documents many reporters who received more beat days than she did during 2017.

Another example of a potential differential application of rules is evident in Ms. Benson's experience in January of 2017, when Ms. Benson was 8 months pregnant and there was a shortage of photographers on shift. Ms. Benson preferred not to MMJ and another reporter, Ali Hoxie agreed to do so in her stead. Nonetheless, manager Carla Kreegar still required that Ms. Benson take on this role. A manager certainly has the right to determine which employees take on which tasks, but this raises the serious question of whether the manager would have reversed a similar employee solution to a problem had the actors been different. Implicit bias may mean that members of some groups are given more leeway, and more benefit of the doubt in uncertain situations than others. Ms. Benson appears not to have received the consideration that other employees received.

The "tightrope" metaphor is based on the idea that Blacks (and other "minority" groups) may be allowed a narrower range of behavior in the workplace than Whites. For example, direct and assertive behavior in White men is often viewed as acceptable "ambition" and "leadership potential," but as inappropriate signs of "anger" and "abrasiveness" when engaged in by Blacks. Self-promotion in White men is generally seen as a good thing, but may be seen as problematic in women (whether Black women in particular face this bias is unclear). White men can be angry

8

or emotional without harm to their perceived competence, but lack of perceived "niceness" may harm the perceived competence of others. It is worth noting that concerns about Ms. Benson's competence were raised after the feedback meeting in 2015 when she was accused of being aggressive and combative.

I have already made reference to the likelihood that punishment (e.g., suspensions) were harsher toward Ms. Benson than toward other similarly-behaving employees. Ms. Benson also claims that since she first reported "ongoing differential treatment, racial discrimination and a hostile work environment" to the Ethicpoint Line in May 2015, she has faced retaliatory action from KSHB. The evidence I have reviewed does seem to indicate an escalation of negative evaluations and negative treatment of Ms. Benson after that time. The social science research literature provides considerable evidence that those who claim discrimination are viewed negatively by others (they are seen as "troublemakers" and "complainers"), even when there is strong reason to believe that discrimination did indeed occur. Defensiveness and denial are common responses, and these may indeed lead to heightened negative treatment and distancing.

All of my opinions and conclusions herein are based on a reasonable degree of scientific certainty, as used by those in my field. To summarize, many of Ms. Benson's experiences map onto what social science researchers know about how race bias operates. Based on what I have learned thus far, it is likely in my professional opinion, that many of Ms. Benson's work experiences—including her continued assignment to cover "urban" stories, her failure to be awarded promotions and other career development opportunities, her characterization as "disruptive" and "aggressive," and her workplace suspensions—can be attributed to race bias on the part of her supervisors. I do want to make clear that I am not opining that race alone was the only factor contributing to Ms. Benson's outcomes, or that Ms. Benson has been the perfect

Case 4:17-cv-00041-BP   Document 297-1   Filed 12/21/18   Page 10 of 11

employee who deserved every promotion for which she applied. Much social science research documents that "objective" performance matters for how employees are evaluated as well (good performance is judged better than poor performance for all racial groups). What I am concluding to a reasonable degree of professional certainty is that given the same level of performance—especially when that performance is ambiguous or open to interpretation—race bias leads to more negative outcomes for Black than White employees. I believe and am of the professional opinion that pattern played out in Ms. Benson's case.

I reserve the right to update my report, and my professional conclusions, as deemed necessary upon receiving additional relevant information.

9/29/17
Date

Monica R. Biernat, Ph.D

10