IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| LISA BENSON COOPER, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 17-0041-CV-W-BP |
| SCRIPPS MEDIA, INC., d/b/a KSHB-TV 41, | ) ) ) |
| Defendant. | ) |

**ORDER AND OPINION DENYING DEFENDANT'S
RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

Following jury verdicts in favor of Plaintiff on two claims, Defendant has filed a Renewed Motion for Judgment as a Matter of Law. For the following reasons the motion, (Doc. 408), is **DENIED**.

## I. BACKGROUND

Plaintiff filed this suit in state court, asserting claims of racial discrimination, hostile work environment, and retaliation. Defendant removed the case to federal court. While the case was pending Defendant elected not to renew Plaintiff's contract, and Plaintiff added another claim of retaliation based on that decision.

Summary judgment was granted to Defendant on some claims, and Plaintiff elected not to submit other claims to the jury. Ultimately, the following four claims, all based on 42 U.S.C. § 1981, were submitted to the jury:

- Plaintiff was denied a promotion to weekend anchor in 2013 based on her race.

- Plaintiff was denied a promotion to consumer investigative reporter in 2015 based on her race.

- Plaintiff was suspended in 2015 in retaliation for complaints about discrimination, ("the 2015 retaliation claim").
- Plaintiff's contract was not renewed in 2018 in retaliation for filing this lawsuit, ("the 2018 retaliation claim").

The jury found for Defendant on the two promotion claims. (Doc. 393, pp. 1-2.)[1] The jury found for Plaintiff on the 2015 retaliation claim and awarded her $1,000 in actual damages and $50,000 in punitive damages. (Doc. 393, p. 3.) The jury also found for Plaintiff on the 2018 retaliation claim and awarded her $25,000 in actual damages and $125,000 in punitive damages. (Doc. 393, p. 4.)

Defendant's Renewed Motion for Judgment as a Matter of Law[2] argues that Defendant is entitled to judgment as a matter of law on the 2018 and 2015 retaliation claims, respectively. The motion alternatively argues that (1) it is entitled to judgment as a matter of law with respect to the punitive damage awards on both claims and (2) the punitive damages awarded for the 2015 retaliation claim violate the Due Process Clause. Additional facts about Plaintiff's claims will be discussed in context with Defendant's arguments, but as discussed below, the Court does not agree with Defendant's arguments and concludes that its motion should be denied.[3]

## II. DISCUSSION

Defendant has renewed the Motion for Judgment as a Matter of Law it made during the trial. *See* Fed. R. Civ. P. 50(b). In considering the motion, the Court cannot weigh the evidence; instead it must construe the evidence in the light most favorable to the jury's verdict. *E.g.,*

---

[1] All page numbers are those generated by the Court's CM/ECF system.

[2] Defendant has not filed a Motion for New Trial.

[3] Defendant presents numerous arguments that mischaracterize events at trial or the basis for the verdicts in Plaintiff's favor and then presents "straw man arguments" that it then "refutes" to support its request for judgment as a matter of law. The Court will not address all these arguments.

2

*Letterman v. Does,* 859 F.3d 1120, 1124 (8th Cir. 2017). "Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining the position of the nonmoving party." *Id*. (quotations omitted). As a general matter, Defendant's arguments do not consider the evidence in the light most favorable to the jury's verdict, and instead focus on the facts favoring its position.[4] When viewed in the proper light, however, there was evidence to support the jury's decisions.[5]

### A. The 2018 Retaliation Claim

Defendant insists that it is entitled to judgment as a matter of law on the 2018 retaliation claim because it had good reasons to not renew Plaintiff's contract, including:

- Plaintiff shared an article on her personal Facebook page that other employees complained about as disparaging of Caucasian women.[6]

---

[4] In referencing the testimony, the parties have cited various volumes of, and pages from, the transcript. They have also quoted testimony. However, when their submissions were filed no certified transcript existed; a certified transcript of the second day of trial was filed four days before Defendant filed its Reply Suggestions, but that transcript is not cited. The "transcript" cited by the parties is a rough draft ordered and paid for by Defendant (copies of which were made available for purchase by Plaintiff). When Defendant's counsel ordered the rough draft, he signed a form confirming that he understood that "[t]he rough draft transcript may not be relied upon for purposes of verbatim citation of the record or used for any purpose that requires a certified transcript of a proceeding." Plaintiff's counsel signed the same agreement. Neither party adhered to this agreement, as both (1) quoted verbatim from the rough draft and (2) cited pages from the rough draft to support their arguments and thus used the rough draft for purposes for which a certified transcript is required. While a certified transcript now exists, the pages in the rough draft do not correspond precisely to the pages in the certified transcript. The Court will not rely on the rough draft, nor will it try to find the appropriate pages in the certified transcript. Instead, the Court will rely on its notes taken during the trial.

[5] Defendant couches many of its arguments in terms of Plaintiff's failure to satisfy various components of the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). While the burden-shifting framework is useful at the summary judgment stage, this case went to trial and the jury returned a verdict, so the Court "need not proceed through each step of the *McDonnell Douglas* burden-shifting framework, but may consider whether [the plaintiff] has provided sufficient evidence of retaliation to create a submissible case. The plaintiff in a retaliation case must present sufficient evidence for a reasonable jury to conclude that her protected conduct was a determinative factor in a materially adverse employment action taken by the employer." *Hervey v. County of Koochiching,* 527 F.3d 711, 722 (8th Cir. 2008) (citations omitted).

[6] All postings referenced in this Order were made on Plaintiff's personal Facebook page.

3

- Plaintiff posted what was described as an African proverb stating that "The child who is not embraced by the village will burn it down to feel its warmth," which Defendant took to be a threat against the news station.
- Plaintiff's statement that she was not going to settle this lawsuit and that she wanted "her head on a stake" – which (1) Defendant believed referred to the station's news director, Carrie Hofmann, and (2) Defendant took as a potential threat.
- Plaintiff was disingenuous when meeting with an outside investigator hired by Defendant.
- Defendant violated her contract by failing to file tax returns.[7]

Defendant also argues that it acquired evidence after the nonrenewal of Plaintiff's contract that would have led to her immediate termination, which would have limited the extent of Plaintiff's damages. *E.g., Smith v. AS Am., Inc.,* 829 F.3d 616, 625-26 (8th Cir. 2016). The after-acquired evidence included evidence of a Facebook post about Melania Trump.

The jury could have credited Defendant's explanations – but it was not obligated to do so. A jury can reject an employer's explanation because it is contradicted by other evidence. A jury can also decide that a proffered explanation is simply unworthy of belief on its face.[8] Here, there was abundant evidence supporting the jury's determination that Plaintiff's contract would have been renewed but for the fact that she filed this lawsuit. The jury heard evidence about the content of the article Plaintiff shared on Facebook and could have found that it was a commentary on a newsworthy issue, was not disparaging of Caucasian women, was similar to postings made by

---

[7] Defendant also suggests that it is entitled to judgment because "Plaintiff's contract expressly provided Scripps the right not to renew it for any reason and [this is] sufficient to establish that the decision was not retaliatory . . . ." (Doc. 409, p. 6.) The fact that Defendant had the discretion to decide not to renew the contract did not mean that its decision was non-retaliatory, and the fact that it had such discretion does not provide a defense to a claim of retaliation.

[8] The jury was instructed that it may consider "whether a witness's testimony sounded reasonable" as one of many factors when deciding what testimony to believe. (Doc. 392, p. 15.)

4

other employees who were not subject to discipline, and that the complaints and concerns were overblown. The jury also heard evidence that the post described as an African proverb was meant as a summary of a theme from the movie "Black Panther," and that any concerns about it being related to Defendant were contrivances. Similarly, there was evidence that Plaintiff's statements about wanting the news director's head on a stake was an expression of anger and not meant literally – and that Defendant's belief that Plaintiff literally threatened violence was overblown and, hence, indicative of pretext. Finally, there was evidence suggesting Plaintiff's failure to file tax returns was such a minor transgression that Defendant's reliance on that ground suggested pretext.

In addition, (and this is only some of the evidence supporting the jury's verdict), the station's general manager, Steve Watt, testified that:

- He interpreted the African proverb and the statement about Hofmann as referring to Plaintiff's lawsuit.

- He did not interpret the African proverb as a threat of violence, but rather a threat to not settle and proceed to trial.

- Plaintiff's lawsuit, and specifically her insistence on proceeding to trial, was "hard on the newsroom."

- While some employees engaged in arguably similar conduct on Facebook (both with respect to the article posted before Plaintiff's contract was not renewed and the post about Melania Trump), it was not certain that Defendant would take the same action regarding the other employees.

5

- Some of the concerns that purportedly led to the decision not to renew Plaintiff's contract were known well before the decision was made, yet Defendant did not take action or even act concerned at the time it became aware of them.

Again, just because some witnesses testified that these matters were important to Defendant and that Defendant did not act because of Plaintiff's lawsuit does not mean that the jury had to believe that testimony, particularly in light of contrary evidence. Similarly, the jury did not have to believe that Defendant would have inevitably terminated Plaintiff. The evidence does not compel these conclusions, and the Court cannot weigh the evidence when evaluating a motion for judgment as a matter of law.[9]

Defendant also argues that Plaintiff's attempts to compare her conduct to other employees was legally insufficient because the conduct of the other employees was not the same as the conduct Plaintiff engaged in. The Court disagrees. The jury was entitled to hear evidence about employees who engaged in conduct that was the same *or similar* to Plaintiff's conduct yet were treated in different ways. *E.g., Rodgers v. U.S. Bank, N.A.,* 417 F.3d 845, 851-52 (8th Cir. 2005); *see also Wimbley v. Cashion,* 588 F.3d 959, 962 (8th Cir. 2009). Thus, for instance, Plaintiff did not need to introduce evidence establishing that another employee shared the exact same article on Facebook. *E.g., Ridout v. JBS USA, LLC,* 716 F.3d 1079, 1085 (8th Cir. 2013). Plaintiff could rely on evidence demonstrating that other employees engaged in similar conduct. The Court acknowledges Defendant's argument that it did not regard the other employees' conduct to be similar, or as serious as Plaintiff's – but given that the conduct need not be identical, whether two employees are sufficiently similar is often a question of fact which, when disputed, requires

---

[9] Defendant also seems to suggest that its right to exercise its business judgment entitles it to judgment as a matter of law. (*See, e.g.,* Doc. 409, pp. 9, 12-13.) The Court notes that a business judgment instruction was read to the jury, (Doc. 392, p. 25), and the fact that Defendant invokes its right to exercise its business judgment does not mean that the jury had to find for Defendant.

resolution by the jury. *E.g., Jones v. Evergreen Packaging, Inc.,* 536 Fed. App'x 661, 662 (8th Cir. 2013) (citing *George v. Leavitt,* 407 F.3d 405, 414 (D.C. Cir. 2005)). For instance, Plaintiff compared the article she shared to one shared by another employee that was authored by Kareem Abdul-Jabbar. Given the broad concerns Defendant expressed about Plaintiff's post, the two actions appeared similar in many respects. Defendant was free to explain to the jury why it regarded Plaintiff's actions as different and more serious – but there was evidence suggesting that the differences were inconsequential, and the jury was not legally required to credit Defendant's explanation.

For these reasons, Defendant is not entitled to judgment as a matter of law with respect to the 2018 retaliation claim.[10]

### B. The 2015 Retaliation Claim

Defendant's argument regarding the 2015 retaliation claim is narrower than the argument it presents regarding the 2018 retaliation claim. With respect to this claim, Defendant argues that there was no evidence demonstrating that the decisionmaker (Hofmann) knew about Plaintiff's protected activity. The Court disagrees.

By way of background: Plaintiff testified that on April 27, 2015, she participated in a meeting with her direct supervisor, Melissa Greenstein; Hofmann also attended this meeting. Among the topics discussed were Plaintiff's concerns regarding her schedule. During the meeting Greenstein made comments critical of Plaintiff's work performance, which greatly bothered Plaintiff. Plaintiff left that meeting before it was concluded; the manner of her departure and her reason for doing so were characterized in a variety of ways, but these matters are not important to

---

[10] The Court's discussion makes it unnecessary to consider Plaintiff's alternative argument that Watt's testimony constitutes direct evidence that Plaintiff's lawsuit (or her refusal to settle and insistence on going to trial) played a part in his decision to not renew her contract. (*See* Doc. 423, pp. 10-12.)

7

the Court's analysis of this issue. Later that night, Plaintiff authored two emails; the recipients included Hofmann, Greenstein, and Julie Moorehouse. Moorehouse was an HR representative in Defendant's offices in Ohio. The emails complain about differential treatment and suggest a disparity between the comments in the meeting and Plaintiff's reviews, but there is nothing in the emails that suggests any of the treatment was based on race. (Plaintiff's Exhibits 20 & 21.)[11] Another meeting was held on April 28, during which (according to an email authored by Hofmann) it was agreed that another meeting would be held the following week so that Plaintiff could "give specifics of the . . . 'preferential treatment' . . . by newsroom management." (Plaintiff's Exhibit 94.)

In early May, Moorehouse called Plaintiff to obtain more information about Plaintiff's concerns. Plaintiff expressed her belief that various tactics (such as assigning undesirable shifts) were utilized to force out minority employees. (Plaintiff's Exhibit 104.) There was testimony that Moorehouse's role was to keep Hofmann informed of her interactions with Plaintiff, and that Defendant's policies/procedures also required Moorehouse to discuss Plaintiff's concerns with Hofmann because (1) Hofmann was the news director and (2) Plaintiff's complaint made accusations about Hofmann. Hofmann testified, however, that Moorehouse did not relate anything about her conversations with Plaintiff, and that when she suspended Plaintiff for two days in late May 2015 she did not know that Plaintiff had engaged in protected conduct by making a complaint about race discrimination.

Defendant argues that there is no evidence that Hofmann – the decisionmaker with respect to the retaliatory suspension – knew about Plaintiff's protected conduct, so Plaintiff's protected conduct could not have had any role in Hofmann's decision. The Court agrees that there is no

---

[11] In her testimony, Plaintiff suggested that there were "haves and have-nots" in the newsroom, and that many of the "haves" were Caucasian – but her emails did not convey a complaint that the differential treatment was based on race.

direct evidence that Hofmann knew about Plaintiff's protected conduct but concludes that there is circumstantial evidence that would permit the jury to conclude that she knew.

The Court agrees with Defendant that for Plaintiff to prevail there needed to be evidence that a decisionmaker (here, Hofmann) knew about Plaintiff's protected conduct. *E.g., Porter v. Lake Lotawana,* 651 F.3d 894, 898-99 (8th Cir. 2011); *Robinson v. Potter,* 453 F.3d 990, 994 (8th Cir. 2006). This requirement makes sense as a matter of logic: if the decisionmaker does not know about the employee's protected conduct, then the protected conduct could not have been a factor in the decisionmaker's decisions.[12] Here, Hofmann insisted that she did not know about Plaintiff's complaint of race discrimination to Moorehouse, and if that were the only evidence in the case Defendant might well prevail. However, there was additional evidence: the jury was entitled to infer that Moorehouse did tell Hofmann because two witnesses – Hofmann and Erika Storrs (another HR representative) – testified that is what should have happened, and that this is what would normally happen. In fact, there was evidence that this was precisely why Moorehouse was involved in the first place: to gather information about Plaintiff's concerns and share it with Hofmann. The jury was entitled to disbelieve Hofmann and conclude that Moorehouse did what she was supposed to do (particularly after having the opportunity to observe Hofmann's testimony and evaluate her credibility for itself).

This evidence may not have been conclusive; it may not even have been particularly strong; it may not have been sufficient to persuade the Court if it had been the finder of fact – but these

---

[12] Plaintiff presents two arguments that the Court does not find compelling. First, Plaintiff suggests it is enough that any of Defendant's agents knew about her protected conduct because Plaintiff is suing Defendant, not Hofmann (or any other individual). (Doc. 423, p. 8.) The Court rejects this argument as contrary to the authorities cited above. Second, Plaintiff argues that the temporal proximity between Plaintiff's protected conduct and the suspension demonstrates a causal connection between the two events. (Doc. 423, pp. 9-10.) In circumstances where the decisionmaker knew about the protected conduct, temporal proximity may justify an inference that the decisionmaker was *motivated by* the protected conduct. However, temporal proximity cannot establish that the decisionmaker *knew about* the protected conduct.

9

are not the questions before the Court. The only question is whether the evidence points in only one direction, and that is not the case here. When construed in Plaintiff's favor, there is evidence supporting the jury's verdict.

### C. Punitive Damages (Generally)

Defendant argues that it is entitled to judgment as a matter of law on the punitive damage claims because Watt knew of the reasons for not renewing Plaintiff's contract (such as that Plaintiff said that she wanted Hofmann's head on a stake, referred to "burning down a village," and failed to file tax returns). (Doc. 409, p. 18.) Defendant expands on its argument in its Reply Suggestions, arguing that "the most important inquiry is whether the employer believes its conduct was lawful because the entire purpose of punitive damages is to prevent willful and knowing violations of federal[ly] protected rights." (Doc. 440, p. 19.) Defendant's argument is, essentially, that as a matter of law it cannot be liable for punitive damages because its witnesses testified that they believed they acted lawfully. (*See, e.g.,* Doc. 440, pp. 19-20.) This is not an accurate statement of the law, and in any event this argument requires the Court to view the evidence in the light most favorable to Defendant (which, as stated, is not the proper perspective). For these reasons, the Court rejects Defendant's argument.

### D. Punitive Damages With Respect to the 2015 Retaliation Claim

Finally, Defendant contends that the $50,000 punitive damage award on the 2015 retaliation claim must be reduced because it exceeds the limits imposed by the Due Process Clause. The Court disagrees.

"Under the Fourteenth Amendment's Due Process Clause, grossly excessive civil punishment is prohibited. . . . Similar to compensatory damages, punitive damages are grossly excessive if they shock the conscience of this court or . . . demonstrate passion or prejudice on the

part of the trier of fact." *Trickey v. Kaman Indus. Techs. Corp.,* 705 F.3d 788, 802 (8th Cir. 2013) (cleaned up). When determining whether a punitive damage award shocks the conscience, the Court should consider:

1. The reprehensibility of Defendant's conduct,

2. Any disparity between the harm suffered and the punitive damages awarded, and

3. The difference between the punitive damage award and any civil penalties that might be authorized.

*E.g., id.* The first factor is the most important and requires the Court to consider whether the harm was physical or economic; whether indifference or reckless disregard of the health or safety of others was involved; the plaintiff's financial vulnerability; whether the conduct complained of was isolated or repeated; and whether the harm was the result of intentional malice or an accident. *E.g., Bryant v. Jeffrey Sand Co.,* 919 F.3d 520, 527 (8th Cir. 2019).

Having evaluated these factors, the Court concludes that the amount of punitive damages awarded is not conscience-shocking or the product of passion or prejudice. Plaintiff did not suffer a physical injury, and other than the two retaliation claims found by the jury in this case there is no evidence of repeated retaliatory conduct by Defendant. However, viewed in Plaintiff's favor, the jury could have believed that Hofmann (1) falsely denied knowing about Plaintiff's complaint (based on the analysis in Part II.A) and then (2) a mere three weeks after learning of the fact decided to suspend Plaintiff for reasons that did not result in the suspension of others.[13] This may not be the most reprehensible example of retaliation to have ever occurred – but that is not the

---

[13] Defendant's motion does not present an argument that Defendant presented during trial; specifically, that Plaintiff's comparison of her discipline to the discipline received by Sam Eaton was inapt because Eaton yelled at a co-worker and not a supervisor. While the failure to present the issue after trial means that it need not be addressed, the Court observes that this is another situation in which it was the jury's role to determine whether Defendant's stated justifications for the differing treatment were really a means of obscuring its retaliatory intent.

standard. Moreover, the punitive damages were, in the abstract, relatively modest, particularly in light of Defendant's net worth, and thus reflect the "relative reprehensibility" of Defendant's actions.

Defendant focuses on the fact that the punitive damage awarded on this claim is fifty times the amount of actual damages. In a case such as this, when actual damages were admittedly rather low,[14] the ratio between punitives and actuals is not controlling. "'Punitive damages may withstand constitutional scrutiny when only nominal or a small amount of compensatory damages have been assigned, even though the ratio between the two will necessarily be large.'" *Bryant*, 919 F.3d at 528 (quoting *JCB, Inc. v. Union Planters Bank, NA,* 539 F.3d 862, 876 (8th Cir. 2008)). In fact, ratios far greater than 50:1 have been approved. *E.g.*, *JCB, Inc.*, 539 F.3d at 877 (approving $108,750 in punitive damages where only nominal damages had been awarded). Given the amount of the award (particularly as compared to the other factors the jury was instructed to consider, *see* Doc. 392, pp. 29-30), the Court does not believe that the punitive damages awarded for the 2015 retaliation claim were constitutionally excessive.

### III. CONCLUSION

For these reasons, Defendant's Renewed Motion for Judgment as a Matter of Law is **DENIED**.

**IT IS SO ORDERED.**

                                                    /s/ Beth Phillips
                                                    BETH PHILLIPS, CHIEF JUDGE
                                                    UNITED STATES DISTRICT COURT

Date: June 26, 2019

---

[14] Plaintiff's actual damages consisted of two days of lost pay.